# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

United States of America,

    Plaintiff,

vs.

Raven Hendricks,

    Defendant.

CR 16-02150-TUC-CKJ (JR)

**REPORT AND RECOMMENDATION**

This matter was referred to Magistrate Judge Rateau for pretrial matters. On April 6, 2017, Defendant Raven Hendricks filed a Motion to Suppress Evidence. Doc. 37. The Government filed a Response on April 20, 2017. Doc. 39. The defense did not file a reply. The matter was heard by the Court on April 26, 2017. Defendant was present and represented by counsel. The Government presented one witness, Border Patrol Agent Henry Schwenkhoff. Doc. 42. Ten Government exhibits were admitted. Doc. 43. One defense exhibit was admitted. Doc. 44. Having considered the matter, the Magistrate Judge recommends that Defendant's motion be denied.[1]

---

[1] Trial is scheduled for July 18, 2017 and the plea deadline is June 30, 2017. Doc. 46.

1

# I. Findings of Fact

In late October of 2016, Border Patrol Agent Henry Schwenkhoff was performing targeted enforcement in the vicinity of Pisinimo and Santa Cruz on the Tohono O'odham Indian Reservation along Federal Route 21 and State Route 86 in Southern Arizona. Tr. 7-8; Gov. Ex. 9 (map of patrol area).[2] FR 21 runs approximately 30 miles from the international border to SR 86. Tr. 8. The reservation covers an area approximately the size of the State of Connecticut and, particularly in the area of the intersection of FR 21 and SR 86, is remote and rural. Tr. 8.

On October 22, 2016, Agent Schwenkhoff started duty at noon in Casa Grande, Arizona, and drove in his assigned vehicle, an unmarked dark gray 2011 Chevrolet Tahoe, approximately 90 miles to his assigned area around FR 21. Tr. 10-11. The agent was not in his Border Patrol uniform, but was wearing an "outer armored vest carrier" that had insignia on it indicating he was law enforcement. Tr. 11.

At approximately 4:00 p.m., Agent Schwenkhoff was parked in a concealed manner near a "dumpster-type receptacle" located at the southwest corner of the intersection of FR 21 and SR 86, which enabled him to monitor traffic on both roads. Tr. 8, 11-13, 45-46; Gov. Ex. 1 (photograph of location). The agent then observed a "maroonish" Ford Windstar minivan traveling northbound on FR 21 approaching SR

---

[2] "Tr." refers to the transcript of the April 27, 2017 evidentiary hearing. "Ex." refers to the exhibits that were admitted at the hearing.

86. Tr. 13-14, 36-37 (description of van). He noticed two observable female occupants in the front seats. Tr. 14. He also noticed that the second seat appeared unoccupied and that in the rear compartment, where there would "usually or sometimes" be a third seat, there was no seat. Tr. 14. As the minivan approached a cattle guard that runs the width of FR 21 about 30 feet south of the stop sign at SR 86, the driver came to almost a complete stop short of the stop sign at the cattle guard. Tr. 14-16, 19-20, 46-47; Gov. Ex. 2, Gov. Ex. 5 (photographs of intersection, stop sign and cattle guard). Then, as the driver approached the stop sign and came to a complete stop, Agent Schwenkhoff said "it appeared to me like she saw me at the last second out of the corner of her eye, or something like that." Tr. 16, 20. She turned her head over her shoulder, "[n]ot just like looking to the side, but almost turning around in her seat . . . ." Tr. 16-17. In his 14 years of experience, he had never seen anyone approach the cattle guard in that manner or turn the way she did, so it caught his attention. Tr. 18. Then, at the last moment, the driver acknowledged the agent's presence by, in an overly exaggerated manner, "waving while she's looking over her should and approaching the stop sign . . . ." Tr. 18-19.

The minivan then signaled and safely navigated a turn onto westbound SR 86 and Agent Schwenkhoff decided he was going to follow the vehicle "to further investigate any other suspicious behaviors that the driver may exhibit." Tr. 21. As he pulled out, two other "civilian vehicles" were able to get between the minivan and his unmarked patrol vehicle. Tr. 21-22. He lost visual contact with the minivan for a short time, but had no problem passing the two vehicles and then "could see for miles

3

and miles ahead." Tr. 22. While driving, although his focus remained on finding the minivan, he recalls receiving a "be on the look out" notification for a white pick-up traveling southbound on FR 1. Tr. 24. He continued driving for about 15 minutes until he reached the intersection of SR 86 and FR 34 and parked on the northwest corner. Tr. 24, 50, Gov. Ex. 7 (photograph of location marked where agent's car was stationed). From that vantage point, the agent could observe the traffic traveling northbound on FR 1, north and southbound on FR 34, and east and westbound on SR 86. Tr. 24.

After sitting at the intersection of SR 86 and FR 34 for approximately five minutes, he observed a minivan "roughly matching the description" of the minivan he had previously observed at the intersection of FR 21 and SR 86. Tr. 28-29. The minivan was traveling westbound on SR 86 approaching his position and was signaling to turn northbound onto FR 34. Tr. 29, Gov. Ex. 8 (photograph of FR 34 looking northbound from SR 86), Gov. Ex. 11 (photograph marked showing agent's vantage point at intersection of FR 34 and SR 86). As the vehicle passed, Agent Schwenkhoff again observed the two female occupants in the front seats and recognized the driver and the same individual who was driving the minivan that he had noticed earlier when it was traveling northbound on FR 21 toward SR 86. Tr. 28-29. This time, however, the driver's actions were "markedly different" from the first time he observed her. Tr. 29-30. The agent explained:

> She would have been looking right at me as she navigated that turn northbound to 34 and she did not acknowledge me. She appeared to be . . . in a rigid posture, I guess. In a very uncomfortable, rigid posture.

4

> Again, it's not weird not to be acknowledged, but she had just seen me 10, 15 minutes earlier and she was extremely friendly at the time. This time she's, I mean, not gesturing toward me or not paying attention to me at all.

Tr. 30. As the driver approached the intersection, she crossed a cattle guard, but this time was driving "quite a bit faster" than she had been earlier and did not stop at the cattle guard. Tr. 30-31. As the minivan crossed the cattle guard, Agent Schwenkhoff observed "substantially more bounce to the rear suspension." He noticed again that there were no rear seat passengers and that the third row seat appeared to be folded down or removed. Tr. 31.

The driver's different behavior at the two cattle guards and the handling characteristics further raised the agent's suspicions. Tr. 31-32. He then pulled in behind the minivan, which was then traveling northbound on FR 34, "to observe the behavior of the driver and the handling characteristics of the vehicle." Tr. 32. As FR 34 goes northbound and approaches the intersection with FR 7, the road is potholed and in poor condition and there is also "kind of twisty S-curve as the road travels around a small mountain range." Tr. 32, 55 (road is "rutty"), 59. The minivan was traveling at approximately the 55 mile per hour speed limit and, as it hit the potholes, Agent Schwenkhoff noticed that the bounce of the rear suspension was substantially more pronounced than what he observed the first, and even the second, time he saw the vehicle, and was inconsistent with having only two passengers in the vehicle. Tr. 32-33, 38-39, 60. Then, as the minivan entered the S-curve, the agent noticed that the driver appeared to be having a difficult time staying within her lane,

5

"[k]ind of like the rear end was swaying across either the white line or the yellow line." Tr. 33, 57.

The agent then relied on his training and experience to evaluate his observations. Tr. 33-34. He noted that the vehicle was traveling on a known smuggling route in a very remote area near the international border, without a lot of traffic. Tr. 34-36. He considered the change in the handling characteristics of the vehicle from when he first observed it traveling on FR 21 to when he observed it on FR 34. Tr. 35. He believed that a vehicle with two occupants would have little trouble handling the potholes and S-curves on FR 34. Tr. 35-36, 61. He also considered the "huge change" in the behavior of the driver between the time he first saw her and the last. Tr. 35. Based on that information, Agent Schwenkhoff informed dispatch that he was conducting a stop, activated his emergency lights, and stopped the vehicle. Tr. 37. The driver was identified as Rosie Garcia and the passenger was identified as the moving defendant, Raven Hendricks. Doc. 1 (Complaint). Ultimately, 98 kilograms, or approximately 220 pounds, of marijuana was found in the back of the van. Tr. 41-42.

**II. Conclusions of Law**

The Fourth Amendment protects a person against unreasonable searches and seizures. *United States v. Hensley*, 469 U.S. 221, 226 (1985). Consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). The police may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are

involved in criminal activity. *Hensley*, 469 U.S. at 226. Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).

When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). This assessment precludes a "divide-and-conquer analysis" because even though each of a suspect's acts may be innocent in and of themselves, when taken together, they may warrant further investigation. *United States v. Arvizu*, 534 U.S. 266, 272 (2002). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct. *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (quoting *Arvizu*, 534 U.S. at 277).

The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1445 (9th Cir. 1994). An officer is however, "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). But the inferences drawn from an officer's experience must be objectively reasonable. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

In relation to stops by Border Patrol agents, the totality of circumstances may include:

> (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

*United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

Guided by these factors the Court must determine whether the facts cited by the Government in support of the present stop constitute behavior that would excite the suspicions of a trained Border Patrol agent that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), *amended by United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

**A.  Characteristics of the Area, Proximity to the Border and Previous Smuggling in the Area**

Law enforcement's awareness that a particular route or location is predominantly used for illegal purposes, including alien and drug smuggling, is strong support for a finding of reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006); *see also Arvizu*, 534 U.S. at 269, 277 (finding it significant that officers found defendant on an unpaved road used primarily by

8

1 ranchers and forest service employees, but commonly used by smugglers to avoid a
2 nearby border checkpoint). However, there is nothing inherently suspicious about
3 vehicles traveling on a public highway, *see United States v. Rodriquez*, 976 F.2d 592,
4 595 (9th Cir. 1992), and where the factors underlying the suspicion depict a very
5 large category of presumably innocent travelers, there is no reasonable suspicion.
6 *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1127 (9th Cir. 2002). As the
7 Ninth Circuit has explained, "[a] location or route frequented by illegal immigrants,
8 but also by many legal residents, is not significantly probative to an assessment of
9 reasonable suspicion." *United States Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir.
10 2006).

The Government established that the location of the stop is close to the border and Agent Schwenkhoff testified that the Tohono O'odham Reservation is in an area known for drug trafficking and alien smuggling. Tr. 36. However, the agent also agreed that it was not "strange at all" to see two Native American women in a minivan traveling in the area. Tr. 43-44. As such, in terms of raising suspicion of smuggling, these factors merit little weight in the calculus of reasonable suspicion.

### B. Patterns of Traffic and Time of Day

The totality of the circumstances analysis includes a consideration of the modes or patterns of operation of certain kinds of law-breakers. *Berber-Tinoco*, 510 F.3d at 1088. In this case, the Government does not contend that the traffic pattern or time of day contributed to Agent Schwenkoff's suspicion. The patterns of traffic and

1 the time of the present stop carry no weight in the totality of the circumstances
2 analysis.

### C. Behavior and Appearance of the Driver

When Agent Schwenkhoff first noticed the minivan, it came to a near complete stop at a cattle guard that was located well-before a stop sign. Then, noticing the agent, the driver "almost turn[ed] around in her seat" and then began waving to him in an overly exaggerated manner. The driver's reaction was unlike any the agent had seen before. Such conduct is a factor that supports reasonable suspicion. *See Brignoni-Ponce*, 422 U.S. at 885 (stating that "the driver's behavior may be relevant . . . [to] support a reasonable suspicion" that criminal activity is afoot). Agent Schwenkoff's suspicions were legitimately bolstered by the driver's subsequent actions. When the agent spotted the minivan the second time, he was not greeted with the overly exaggerated wave he previously received. Rather, although the driver was looking right at him as she navigated a turn, she did not acknowledge him and appeared uncomfortable and rigid. That behavior, particularly when compared to the driver's behavior just 10 or 15 minutes earlier, strongly supports the agent's decision to stop the vehicle. *See Arvizu*, 534 U.S. at 276 (finding that driver's rigid posture and passenger's odd behavior contributed to finding of reasonable suspicion).

### D. Characteristics of the Vehicle

Agent Schwenkhoff testified that the minivan appeared to be heavily loaded. He based his belief on his observation that the van bounced more than he expected it

to as it traveled along a pot-holed road and that the driver appeared to have some difficulty keeping the van within the lane of travel. The Ninth Circuit has approved of these considerations when evaluating reasonable suspicion. *United States v. Diaz-Juarez*, 299 F.3d 1138,1142 (9th Cir. 2002) (that vehicle "bounced erratically" contributed to reasonable suspicion that it was carrying drug load); *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995) ("truck appeared heavily ladened based on the way it reacted to bumps").

Defendant Hendricks contends that the vehicle could not have been handling as the agent described. On cross-examination, the agent agreed that, when carrying two people, the van was rated to carry an additional 900 pounds of luggage. Tr. 41; Def. Ex. 3 (photograph of maximum load sticker). Noting that just over 200 pounds of marijuana were found in the van, Hendricks asserts that the additional weight of the marijuana would not have caused the vehicle to act as the agent described. However, the agent's testimony describing the handling characteristics of the vehicle was credible and there is no evidence before the Court that would establish that the added weight could not have caused the vehicle to bounce or become more difficult to handle in curves. Thus, although not as patently incriminating as the driver's behavior, the Court finds that the handling characteristics of the vehicle are properly considered in evaluating reasonable suspicion.

### E. Totality of Circumstances

Agent Schwenkhoff testified that he has been a United States Border Patrol Agent for approximately 14 years. Tr. 5. Based on his experience and training, he

based his decision to stop Hendricks' vehicle on the following factors: (1) Hendricks was stopped in a known drug trafficking area approximately 30 miles from the border; (2) the driver came to a near complete stop at a cattle guard; (3) on their first encounter, the driver turned her body toward the agent and exaggeratedly waved to him; (4) on their second encounter, 10 or 15 minutes later, the driver did not acknowledge the agent; and (5) the vehicle was bouncing and handling as if heavily loaded when he could see only two occupants.

Giving due weight to each of the factual inferences, and considering them in the totality and in light of Agent Schwenkoff's 14 years of experience with the Border Patrol, Tr. 5, the Court finds that the agent had reasonable suspicion to believe that Hendricks and her co-defendant were engaged in illegal activity. Thus, the stop comported with the Fourth Amendment.

**III. Recommendation for Disposition by the District Judge**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant's Motion to Suppress (Doc. 37).

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment in the case.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from

the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any Objections and Responses to objections filed should be filed as **CR 16-02150-TUC-CKJ**. No Replies shall be filed unless leave is granted from the District Court.

Dated this 8th day of May, 2017.

Honorable Jacqueline M. Rateau
United States Magistrate Judge